# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**People v. Lopez, 2012 IL App (1st) 101395**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ALEX LOPEZ, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-10-1395 |
| Filed | June 22, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions for criminal sexual abuse and unlawful restraint were upheld on appeal where he failed to show that he was deprived of a fair trial by the trial judge's comments suggesting that defense counsel was incompetent and that his defense was a waste of time, his right to present a defense was not violated by the trial judge's decision to allow the State more time for closing argument than defendant, and he failed to show that the prosecutor improperly vouched for the credibility of the victim during closing argument. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CR-21389; the Hon. Lawrence P. Fox, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, and Benjamin Wimmer, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Peter D. Fischer, Assistant State's Attorneys, of counsel), for the People.

Panel

PRESIDING JUSTICE EPSTEIN delivered the judgment of the court, with opinion.

Justices J. Gordon and McBride concurred in the judgment and opinion.

**OPINION**

¶ 1     After a jury trial, defendant Alex Lopez was convicted of criminal sexual abuse and unlawful restraint. He was sentenced to four years in prison. Defendant argues on appeal that: (1) the trial court denied his right to a trial by an impartial jury by making numerous comments before the jury conveying the impression that his "defense counsel was incompetent and his defense a waste of time"; (2) the trial court violated his right to due process of law by indicating, prior to closing argument, that it might impose unequal time limits on defense and State closing arguments; and (3) the State improperly vouched for the credibility of the complaining witness and suggested irrelevant considerations during closing. We affirm.

¶ 2     BACKGROUND

¶ 3     On November 12, 2008, defendant was charged with attempted criminal sexual assault, criminal sexual abuse, and unlawful restraint. Defendant pleaded not guilty and his jury trial commenced on March 8, 2010.

¶ 4     I. State's Case in Chief

¶ 5     A. *MS*

¶ 6     The State first called the complaining witness, MS, who testified to the following version of events. In October 2008, MS was a 17-year-old junior in high school and lived at home with her mother and her brother. Her uncle, Jose Avalos, and his family lived in the same building. Another uncle, Nicholas Hurtado, lived across the street with MS's aunt, Rosa. On October 16, 2008, at approximately 6 p.m., Uncle Nicholas called MS and asked her to come over to help him set up his iPod. MS went out the front door. It was still sunny outside. While standing on her front porch, she saw defendant across the street, masturbating in the gangway by her aunt and uncle's house. She had never seen him before. He was wearing a

black spaghetti strap undershirt and black basketball shorts that were pulled down to his mid-thigh. She could not remember what color shoes defendant wore or whether defendant had facial hair or tattoos. MS also saw a girl walking in front of her uncle's house across the street. MS had never seen the girl before. The "suspicious" girl kept walking, looking back at defendant, and looked worried. MS focused her attention on the girl. When MS looked back to where defendant had been, he was gone. MS did not call out to her uncle or call the police. She waited a few minutes on her porch, "in shock."

¶ 7　　　MS then went across the street to her Uncle Nicholas's house. She walked to the rear door because her aunt did not like people to use the front door. The rear entrance to her uncle's house had two small stairwells. One led up to the rear door, and the other went down to the basement. MS went up the stairs and, as she knocked on the rear door, she saw defendant hidden at the bottom of the steps to the basement. She was approximately five feet away from defendant, who was still masturbating. In a "calm voice," she told defendant he was not supposed to be there and he nodded his head with a smirk. MS knocked harder on the door but did not scream for help because she was in shock. She did not run because she would have had to run past him. Defendant then came up the stairs and grabbed MS's left wrist; his grip was hard and painful. MS kept pushing him away, but was unsuccessful. She was unable to pull herself away from defendant. As defendant held her by the wrist, he pushed MS against the wall and, with his right hand, pulled down her sweat pants and underwear "[r]ight beneath the pubic hair." MS testified "I felt his hand on my vagina." She stated that "[b]asically everything" was exposed.

¶ 8　　　As defendant was restraining her, MS stated she was scared and panicking. She may or may not have screamed. MS heard the locks unlocking on the rear door. Defendant then ran out of the stairwell toward the front of the house. When Uncle Nicholas opened the door, defendant was gone. MS pointed toward where he had run. Uncle Nicholas ran, and MS followed him, to the end of the gangway. MS then saw her Uncle Jose get in his van and chase defendant down the street. Uncle Nicholas ran back down the gangway and MS went inside the house. Family members called the police and they arrived in a few minutes.

¶ 9　　　The police and MS went into the alley behind Uncle Nicholas's house, where there was an unfamiliar car parked. MS testified that she told the police that she saw defendant masturbating and that he had rubbed her vagina with his hand. At trial, she testified that he did not insert his fingers in her vagina.

¶ 10　　　MS went to the police station with her mother and identified defendant in a lineup. She testified that the shirt defendant was wearing during the attack was different than the one he was wearing during the lineup. MS denied telling the police that defendant had been wearing white shoes.

### B. *Nicholas Hurtado*

¶ 12　　　MS's uncle, Nicholas Hurtado testified that he lived with his wife, Rosa, and their baby daughter, across the street from MS. MS came to visit them almost every day and would always use the back door, where there was one stairwell going up to the back door and another going down to the basement.

¶ 13    On October 16, 2008, at approximately 6 p.m., Nicholas was home. Rosa had just had foot surgery and was unable to move around easily. Nicholas had called MS and asked her to come over to his house to help him with his iPod. After a few minutes, he heard a "pretty loud" knock at the back door. He heard a series of knocks. It took him a few seconds to get to the back door and unlock the top and bottom locks. He did not hear voices or screams. As he opened the back door, he found MS crying loudly and pointing down the stairs into the gangway. He tried to calm her down. After 10 to 15 seconds, she was still crying loudly but told him that a man tried to grab her and that she did not know who the man was. Nicholas ran to the front of the house and MS followed. He saw a man, wearing black, running a half block down the street but he was unable to see the man's face. Nicholas also saw his brother-in-law, Jose Avalos, run and jump into his van and follow in the same direction the man in black was running. Nicholas went back to get his shoes and went into the alley but did not find the man. He did see an unfamiliar car parked by the neighbor's garage. The police then arrived in less than 10 minutes.

¶ 14                              C. *Jose Avalos*

¶ 15    Jose Avalos testified that on October 16, 2008, at approximately 6:15 p.m., he looked out his living room window. He saw a man across the street coming out of the gangway of his sister's house. The man was clean shaven and was wearing a sleeveless black shirt and underwear that was "like shorts like boxers." Jose identified defendant in court as that individual. Jose testified that he came out of his house onto the porch and saw his niece and brother-in-law Nicholas coming out of the gangway. His niece was crying. When Jose saw defendant running, he knew defendant had done something wrong, so Jose got into his car and chased defendant down the street.

¶ 16    Jose drove between 10 and 20 miles an hour down several streets following defendant who was approximately two car lengths away. When they came to a one-way street, Jose did not want to drive down it, so he parked his car and started chasing defendant on foot. At that point, he was no more than 10 feet from defendant. Defendant ran into a gangway, turned around, faced Jose, and said, "I'm sorry. I'm sorry." Jose had a clear view of defendant's face. Defendant then turned around and ran down an alley. He eventually ran into another gangway and Jose lost him.

¶ 17    Jose returned to his car and drove back home. He then left again and drove around trying to find defendant, but was unsuccessful. Jose spoke to the police at the scene. Later that same evening, he was contacted by the police. The detectives picked up Jose, his sister Martha, and his niece MS. Jose viewed a lineup at 12:40 a.m. on October 17, 2008 and identified defendant.

¶ 18                          D. *Officer David Mullany*

¶ 19    Chicago police officer David Mullany testified that, on October 16, 2008, he was working with a partner in plain clothes in an unmarked car. At around 6:15 p.m., they received a report of a criminal sexual assault in the 6100 block of School Street. The call included a description of the offender as being a male Hispanic, 5 feet 10 inches to 5 feet 11

inches tall, 190 pounds, wearing a black sleeveless shirt and black shorts. They toured the area on foot for about an hour.

¶ 20    At around 8:30 p.m., the officers were parked on School Street. Sergeant Mullins was in a marked car directly to their left. A purple van pulled up and the back door opened. A male Hispanic, about 5 feet 10 inches to 5 feet 11 inches tall, wearing black shorts and a black shirt got out of the van. He fit the description of the offender heard on the flash message. Officer Mullany made an in-court identification of defendant as that man. As the officers approached, defendant told them that his car was parked in the alley. Officer Mullany testified that they were looking for an Alex Lopez. They asked defendant his name and arrested him after he told them his name was Alex Lopez. The purple van had left immediately after defendant exited and the officers did not get a good look at the driver.

¶ 21                              E. *Detective Emiliano Leal*

¶ 22    Detective Emiliano Leal testified that, during the evening hours of October 16, 2008, he responded to a call. When he arrived at the scene, at least six officers were there. They canvassed the area and a description of the offender was broadcast over the radio. There was a Mitsubishi vehicle parked in the alley that they suspected belonged to the offender. The first thing Detective Leal observed was that there was clothing on the front seat of the car including a pair of pants. There was also a shirt, defendant's wallet, cell phone, and some citations. The police were able to determine that the car was registered to defendant's wife and that defendant was in possession of the car that night.

¶ 23    Detective Leal spoke to MS, who was physically shaking. She appeared to have been crying and the tone of her voice was not clear or even. MS told Detective Leal that she screamed immediately after defendant pulled down her pants and underwear, that defendant "grabbed her crotch" through her clothing, and that at least part of defendant's hand and fingers were inside the waistband of her underwear.

¶ 24    He also spoke to Jose Avalos, who retraced the steps he had taken when chasing the offender. Detective Leal remained on the scene for approximately 20 minutes. He heard over the air that officers had placed someone in custody at 8:31 p.m.

¶ 25    Detective Leal conducted a physical lineup at which both MS and Jose identified defendant as the offender. Detective Leal had defendant wear a jacket because he was the only one wearing a black shirt, but he did not include that fact in his report. He testified that the participants were seated to remove some of the disparities in height and that he had them roll up their pants and put their hands on top of their knees to hide the fact that their pants were rolled up. Defendant was 31 years old at the time and definitely older than some of the participants in the lineup.

¶ 26    On cross examination, the court refused to permit defense counsel to refresh Detective Leal's recollection regarding the ages of the participants in the lineup. The court stated that a party could not refresh a witness's recollection on cross-examination. The court refused to allow defense counsel to be heard at a sidebar and stated, "That's just not the right procedure. You can impeach him." The court also would not allow defense counsel to ask leading questions about what Jose had told Detective Leal because Jose had not yet testified.

## II. Defense Case

### A. *Officer Ruiz Oquendo*

The defense called Officer Ruiz Oquendo as its first witness. She testified that she spoke to MS in the gangway going up the stairs of her uncle's residence. Also present was MS's uncle, aunt, and mother. Officer Oquendo took notes but did not generate a report at that point; she did eventually generate a report. She could not recall whether MS told her that she saw the offender masturbating. Her report did not indicate that MS saw the offender masturbating. Officer Oquendo testified that MS "may or may not have said it." Officer Oquendo stated she was responsible for the preliminary report but there were other people interviewing MS as Officer Oquendo was gathering all the other information. Officer Oquendo testified that her report indicated that MS told her the offender "attempted" to pull down her pants, but that did not mean the offender had not completed the task. She used the word "attempt" because she did not know if the offender got MS's pants down.

On cross examination, Officer Oquendo also testified that MS was quite upset, crying, and was telling her "a lot of things out of order, not in consecutive order as to how they occurred."

### B. *Zeinab Mohamed*

Defendant presented the testimony of his wife, Zeinab Mohamed. On October 16, 2008, defendant drove her to work in her Mitsubishi Gallant. He was wearing long black pants, a long black sweater, a black T-shirt, and glasses. She testified he was not wearing black shorts. Defendant dropped her off at work at 3:25 and was going to pick her up eight hours later. He never did.

### C. *Victor Lopez*

Defendant's father, Victor Lopez, testified next. On October 16, 2008, he was alone in his house, which is on the north side of Chicago. Defendant called him at 4:30 p.m. After the conversation, defendant's father stayed home. He testified that his son has always worn glasses.

### D. *Ibrahim Almirah*

Ibrahim Almirah testified that, on October 16, 2008, he was working in telemarketing at the Al Furquan Foundation in Addison and defendant worked in the warehouse. On that day, defendant called Almirah twice at work. After the second telephone call, Almirah left work at 7 p.m. to pick up defendant in Chicago. He took the gray Ford work van and called defendant for directions on the way.

He arrived 30 to 40 minutes later at a trucking school where defendant had asked him to come. Defendant was wearing a black jacket and dark shorts, as well as the glasses he always wore. Defendant directed Almirah to his car located in an alley. Almirah saw two police cars; one marked and one unmarked. Almirah testified that defendant exited the van, walked

toward the police car and leaned toward the window. Almirah stated that he went to park the van because somebody was honking behind him. He stated that he got out of the van but left when he saw the police putting handcuffs on defendant.

¶ 38    On cross-examination, Almirah stated that he had not arranged to meet defendant at the Dog Stop restaurant in the area. He denied telling the police that such a meeting had been arranged. Almirah talked to defendant about what had happened after he picked him up. Almirah never contacted the State's Attorney's office and testified that he did not know there was any need for that. He stated, "Why would I contact anyone?"

¶ 39                                            E. *Alex Lopez*

¶ 40    Defendant, Alex Lopez, testified in his own behalf. He said that on October 16, 2008, he left home at 3:30 p.m. in his wife's Mitsubishi Galant to take her to work in Warrenville. He dropped her off at about 4 p.m. and went back home where he changed into long black gym shorts, a black T-shirt with a pocket, a black zip-up sweater and black shoes. He testified that he wears glasses for his astigmatism and cannot see without them.

¶ 41    At 4:30 p.m., defendant called his father and drove toward his father's house on the north side of Chicago. At 5:15 p.m., as he was driving east on Belmont Avenue in rush-hour traffic, a minivan started following him. The minivan pulled next to defendant at a stop light and the driver started making hand gestures. Defendant believed that the driver was flashing a gang sign and was a "gang banger." The minivan got behind defendant's car again and continued to follow him. Defendant could not remember the color of the minivan and stated it "seemed like a Ford of some kind." As defendant continued driving eastbound on Belmont Avenue, he noticed the minivan really close behind him so he decided to make a left turn heading north. He did not make the turn at an intersection, but at "a small street." Defendant noticed the minivan was still following him, so he decided to make a left turn into an alley. Again the minivan followed defendant. Defendant testified that he stopped his car, got out, and walked towards the back of his car to "see what he wanted."

¶ 42    The driver got out of the vehicle and put a "hoodie" over his head. Defendant described the man, whom he had never seen before, as being either Hispanic or Caucasian, shorter than defendant, and bald with no facial hair. Defendant asked him what he wanted. Defendant then noticed the back door slide open and realized there were more people in the minivan, so he ran through a gangway. Defendant testified that, as he ran through the gangway "Apparently somebody was *** walking towards me, I guess, and I bumped them." Defendant could not describe the person. He was wearing his glasses at the time but was not sure where he was at in the gangway at the time he bumped this person. Defendant did not say anything and was moving "pretty fast." The other person was walking. After defendant bumped into this person, he ran towards the front sidewalk and then ran down the street in an eastbound direction. He did not see anyone else on the street and he did not see anybody following him in the gangway.

¶ 43    Defendant testified that he stopped to catch his breath because he is asthmatic. He stopped on somebody's property–"the front part of someone's property"–but did not know what street he was on at the time. He was not familiar with this alley or these streets that he

was running on. He stopped for "five to 10 minutes or so." He then realized where he was and walked a block toward the main street, Belmont Avenue. He next walked two blocks westbound on Belmont Avenue. He then started walking through alleys looking for his car.

¶ 44    He located his car and was about a block away when he noticed the front two doors of his car were open and there were people near the car and in the car. He did not know how many people there were and he did not see any police cars. Defendant was afraid to return to his car, so he went to a truck driving school on Belmont Avenue where he had taken a course in 2007. Defendant had left his cell phone in his car, along with some clothing, his wallet, and some money. A person at the school let defendant use his cell phone and defendant called his workplace. He was unable to get in touch with a particular person and called again. Ibrahim Almirah answered, the two had a conversation, and defendant then waited at the trucking school for Almirah to show up.

¶ 45    While waiting for Almirah, defendant occasionally left to check to make sure his car was still there. Then he would return to the school. Defendant testified that when he went to check on his car at no time did he see any police officers or squad cars in the area. He called Almirah "quite a few times" and Almirah also called defendant. When Almirah arrived at approximately 8 or 8:30 p.m., it was dark. Almirah drove defendant to the mouth of the ally and defendant told Almirah to leave him there. There were two police cars there. Defendant testified that he approached the passenger side of one of the cars and knocked on the window. The officer asked defendant if the car in the alley was defendant's car. Defendant said yes, the officer said "Wait a moment" and got on his radio. Plainclothes officers arrived and asked defendant for his name and how to spell it. The police arrested defendant.

¶ 46    The police took defendant to the station at Grand and Central. He participated in a lineup. Everyone in the lineup was a tall, male Hispanic. Defendant was told to pick a spot and was asked to remove his glasses and put them in his pocket. Defendant was wearing his shorts, shirt and sweater. The other participants were wearing long pants and the officer directing the lineup told everybody to roll up their pants and put their hands on their knees. Defendant denied ever wearing a sleeveless shirt that day and testified that he was wearing a shirt with short sleeves as illustrated in the Cook County jail's booking photo.

¶ 47    Defendant denied that he had ever masturbated in the gangway. He denied that he had approached or touched MS, or seen her before. Defendant bumped only one person in the gangway. He was not sure if the person he ran into in the gangway was MS. Defendant admitted running down School Street that night, but did not see a person chasing him down School Street or any of the other streets with an automobile. He denied turning around while running to say "I'm sorry. I'm sorry." Defendant denied having seen Mr. Avalos before that night.

¶ 48    Defendant stated that he was not given his *Miranda* rights. He testified that, after he was arrested, he spoke with Detective Leal. Defendant denied telling Detective Leal that when he reached the other side of the gangway into School Street he heard an engine start and a vehicle was following him. He denied telling the detectives that he was in the area to meet Almirah at the Dog Stop restaurant. He also denied telling Detective Leal, during any of the several conversations he had with the detective, that Almirah "was lying." Defendant did not

recall being asked by Detective Leal "why in the world" he would pull into an alley if being chased by "gang bangers." Defendant denied telling Detective Leal "Gang bangers always fought in alleys and parks and not in the open."

¶ 49    Defendant admitted that, instead of calling his wife or the police to help him get his car, which was just blocks away, he called Almirah, who was at work in Addison 20 miles away. Defendant also admitted that he knew Almirah not only had to leave work while he was on shift and get a car, but also had to drive at least 50 miles back and forth to pick defendant up to get his car, which was within walking distance of where defendant was waiting.

¶ 50                           III. State's Case in Rebuttal

¶ 51    In rebuttal, the State called Detective Emiliano Leal back to the stand. He testified that he had three conversations with defendant: October 16, 2008 at 9:35 p.m.; October 17, 2008 at 1:40 a.m.; and October 17, 2008 at 4:45 p.m. Detective Leal testified that defendant told him that when he got out of his car, three male Hispanics exited the other vehicle. Defendant also told the detective that he ran into the gangway to escape from them and that, while running, he bumped into a "woman." Defendant told the detective that, when he reached the other side of the gangway, he heard an engine start and a vehicle following behind him.

¶ 52    Defendant also told the detective that, on the evening in question, he was planning to meet with Ibrahim Almirah at the Dog Stop restaurant to study the Koran. He did not tell Detective Leal that he was in the area to visit his father. Defendant also told Detective Leal that gang members always fought in alleys and parks and not in the open. Detective Leal also testified that defendant told him that he was in the alley to fight. Detective Leal testified that, after defendant provided Almirah's number, the detective called him. After Detective Leal spoke to Almirah, he again spoke to defendant, and defendant told him that Almirah "was lying."

¶ 53    The jury found defendant guilty of criminal sexual abuse and unlawful restraint and not guilty of attempted criminal sexual assault. Defendant filed a posttrial motion for a new trial which the trial court denied after hearing arguments. Defendant was sentenced to four years in prison. He now appeals his conviction.

¶ 54                                ANALYSIS
¶ 55                         I. Trial Court's Comments

¶ 56    Defendant first argues that he was denied his right to a trial by an impartial jury as a result of the trial court's comments. He asserts that "the trial court repeatedly and forcefully castigated the defense for violating rules of evidence that *did not exist*." (Emphasis in original.) He also contends that "the trial court frequently sustained *sua sponte* objections to defense questioning on the basis of non-existent rules, and sometimes without any understandable basis." In addition to the comments on these "erroneous rulings," defendant argues that "even the trial court's otherwise legitimate rulings were frequently phrased with excessive and inappropriate hostility that biased the jury" and were "replete with manifestations of hostility" directed toward defendant and his counsel that "inappropriately

revealed the court's low opinion of Mr. Lopez's defense."

¶ 57    A trial judge "must not interject opinions or comments reflecting prejudice against or favor toward any party." *People v. Williams*, 209 Ill. App. 3d 709, 718 (1991). "Improper comments include those which reflect disbelief in the testimony of defense witnesses, confidence in the credibility of the prosecution witnesses or an assumption of defendant's guilt. In addition, a hostile attitude toward defense counsel or remarks that defense counsel has presented his case in an improper manner may also be prejudicial and erroneous." *Id.* A defendant must show that comments by the trial judge were prejudicial and that he was harmed by the comments for them to constitute reversible error. *Id.* "Where it appears that the comments do not constitute a material factor in the conviction, or that prejudice to the defendant is not the probable result, the verdict will not be disturbed." *Id.* at 718-19. Thus, even improper remarks may be harmless error. *Id.* at 719. "[I]n each case an evaluation of the effect upon the jury of a trial court's interjections must be made in the light of the evidence, the context in which they were made and the circumstances surrounding the trial." (Internal quotation marks omitted.) *Id.*

¶ 58                                      A. *Forfeiture*

¶ 59    The State contends that defendant forfeited this issue by failing to object and by failing to include the issue in his posttrial motion and the only way it can be reviewed on appeal is pursuant to the plain-error rule. This is a threshold determination we must make because "[t]he application of plain-error or harmless-error review *** depends on whether defendant has forfeited review of the issue." *People v. Thompson*, 238 Ill. 2d 598, 611 (2010). To preserve an alleged error for review, both an objection at trial and a written posttrial motion raising the issue are necessary. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Defendant concedes that he did neither. However, citing *People v. Sprinkle*, 27 Ill. 2d 398 (1963), defendant argues that the alleged error was not forfeited because "an objection 'would have fallen on deaf ears' or caused the defendant to further bias the jury."

¶ 60    In *Sprinkle*, our supreme court recognized that judicial misconduct could provide a basis for relaxing the forfeiture rule. *Id.*; accord *People v. McLaurin*, 235 Ill. 2d 478, 486 (2009); see also *People v. Nevitt*, 135 Ill. 2d 423, 455 (1990) ("although defendant did not raise any issues concerning the conduct of the trial judge in his post-trial motion, application of the waiver rule is less rigid where the basis for the objection is the trial judge's conduct"). More recently, the Illinois Supreme Court explained:

"The failure to preserve an error will be excused under the *Sprinkle* doctrine only in extraordinary circumstances, however, such as when a judge makes inappropriate remarks to a jury or relies on social commentary instead of evidence in imposing a death sentence. [Citations.] We have stressed the importance of applying the forfeiture rule uniformly except in compelling situations because failure to raise a claim properly denies the trial court an opportunity to correct an error or grant a new trial, thus wasting time and judicial resources. [Citation.]" *People v. Thompson*, 238 Ill. 2d 598, 612 (2010).

Here, the trial court's comments during its evidentiary rulings and closing argument, even if unnecessary or incorrect, were not extraordinary circumstances to justify excusing the

forfeiture by defense counsel. Defendant has forfeited review of the issue.

¶ 61                                    B. *Plain Error*

¶ 62      Nonetheless, the plain-error rule bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved claims of error in specific circumstances. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010); Ill. S. Ct. R. 615 ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court."). A reviewing court can consider a forfeited error where:

> "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Sargent*, 239 Ill. 2d 166, 189 (2010).

A defendant bears the burden of persuasion under each prong of the plain-error test. *People v. Lewis*, 234 Ill. 2d 32, 43 (2009). Defendant now asserts that the alleged error here constitutes a clear error under both prongs.

¶ 63                                    1. Error

¶ 64      The first step of plain-error review is to determine whether any error occurred at all. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). If there was no error in the first instance, there can be no plain error. See *People v. Bannister*, 232 Ill. 2d 52, 79 (2008).

¶ 65      The State notes that "defendant does not raise any of [his] claims as free-standing claims of error." Defendant counters that "[t]wenty-two pages of [his] initial brief organize and describe these rulings and comments, most of which the State ignores or dismisses in a conclusory fashion."

¶ 66      During the State's case-in-chief its first witness was the complainant, MS. On direct examination, MS testified that she did not call out to her uncle when she first saw the defendant masturbating. She also testified that, as she knocked on her uncle's door after seeing defendant masturbating in the stairwell, she did not scream. On cross-examination, she again stated that she did not scream when she first saw the defendant masturbating, and again testified that she was not screaming as she knocked on her uncle's door after seeing defendant masturbating in the stairwell. She also testified that she did not scream when defendant grabbed her. Defense counsel, after asking MS to describe the neighbor's backyard then returned to the issue of screaming, as follows:

> "DEFENSE COUNSEL: When do you start screaming? How long has he touched you?
>
> MS: I never screamed.
>
> DEFENSE COUNSEL: You never screamed at all?
>
> MS: No.

-11-

DEFENSE COUNSEL: Do you remember telling the police that he ran and you screamed?

MS: I don't remember."

On redirect, the State asked MS: "When [defense] counsel was asking you about how shocked you were when this was all going on *** [i]s it that you were screaming or you don't know whether or not you were screaming?" MS stated: "I wasn't screaming." Defense counsel then began his recross by asking "Did you ever scream–when you were answering the Prosecutor's questions, did you ever scream at any time during the attack?" MS replied "No." The State contends that this is but one example of how defense counsel repeatedly asked questions that had been asked and answered and how he badgered the victim in this case.

¶ 67    Also, during defense counsel's cross-examination of MS, the record shows a pattern of repeatedly asking improper questions. Defense counsel misstated witness testimony, repeatedly cut the witness off in the middle of her answers, and asked questions phrased in an improper form, *e.g.*, "Is there anything in the world, [MS], that would have prevented you from going into your house calling 911 and saying oh, me [*sic*] God, there's somebody out there exposing his penis?"

¶ 68    Defense counsel continually asked questions that would have required MS to testify as to someone else's state of mind. He also–at least nine times–asked MS what other people could see or hear, asking what "the rest of the world," "anybody," "your uncle," "anybody else," "Uncle Avalos," or "Uncle Hurtado" could see or hear. After the trial judge had sustained several objections without comment, these types of questions continued unabated. The court then stated: "She can't testify to what somebody else saw." When defense counsel persisted in asking this type of question, the court explained: "She can't testify to what someone else is watching." Undeterred, defense counsel continued asking this type of question. Finally, the court stated: "She can't testify to what view someone else got. I don't know how many times I have to say this." After defense counsel stated he would rephrase, the court stated: "She cannot testify to what someone else saw or what they watched or what view they had. She can only testify about what she saw." Even after this proper admonition, defense counsel again asked MS what her uncle saw. After properly sustaining the State's objection, the court again admonished counsel, stating: "she can't testify what her uncle saw, can she, counsel? And haven't we gone over this before several times now? You can't ask her about what someone else saw. Please stop doing that." Almost immediately thereafter, defense counsel asked MS what her uncle saw. When the State objected, the court asked the parties to come back in chambers.

¶ 69    Once out of the presence of the jury, the trial judge admonished defense counsel:

"THE COURT: First of all, all of these questions have been asked already over and over and over again.

Secondly, I don't know how many times I've cautioned you, I've admonished you, I've asked you, I just pleaded with you please don't continue to ask this witness what someone else saw, and then you absolutely go right ahead and within two questions say he saw the whole thing.

Now, I am not going to put up with this. And I don't want to have to hold you in contempt or threaten you with contempt.

I am asking you to accept the principle of law that maybe you don't understand and you don't want to believe exists. But a witness cannot testify as to what someone else saw. Okay? And don't ask anymore questions that are phrased that way. Okay?

DEFENSE COUNSEL: Judge, am I allowed to ask was his head facing the direction–

THE COURT: Earl, what is it you don't understand about what I just said? You just asked her, so her uncle saw the whole thing. What is it you don't understand about what's wrong with that question?

DEFENSE COUNSEL: All right, Judge.

THE COURT: All right. We don't need to go any further and then to come back at me and say can I ask this or can I ask that. I'm not playing that game.

I'm telling you you've done it over and over again and I'm not going to stand for it for one second longer.

She has been asked these questions. You don't need to ask her any more questions.

The first question you got up and asked her on recross was did you ever scream. Do you know how many times you asked that on original cross? Probably six or eight.

DEFENSE COUNSEL: And that was redirect.

THE COURT: I don't care what they did on redirect. The point is do you understand the basis for an objection, that a question has been asked and answered? That applies if you have asked that question and it's been answered on your original cross-examination.

Now, are you really telling me you don't know that and you don't understand that and you don't accept that? That if on recross you get up and ask the same question you asked on your original cross, that the objection is asked and answered is not a valid objection. Are you really trying to tell me that?

DEFENSE COUNSEL: Judge, they didn't even voice an objection.

THE COURT: I know they didn't. And I didn't rule on an objection either. I'm just telling you what you did and I'm asking whether you understand and accept the principle of law that if you ask the question on cross and you go ahead and re-ask it on recross, the objection asked and answered should be made and it should be sustained. Do you agree with that?

DEFENSE COUNSEL: I would agree.

THE COURT: I would guess if we got the transcript of your cross, it would show that you asked her if she ever screamed at least several times on your original cross.

My point is that question did not need to be asked, should not have been asked. An objection should have been made. It should be sustained.

You are completely wasting this Court's time and this jury's time with that kind of question and I don't appreciate it.

It's 7:00 o'clock at night. This jury thought they were going to get out of here long before this.

-13-

This examination of this witness has been far too long. You've gone over and over everything you could possibly ask this witness, and you better bring it to a close real quickly. Okay?

DEFENSE COUNSEL: Judge, am I permitted to ask her if her Uncle Hurtado's face was facing her and Alex Lopez when he opened up the door? If I'm not, so be it. That is the question I want to ask.

THE COURT: Well, that's not the question you asked.

DEFENSE COUNSEL: Okay.

THE COURT: And if you had asked that question, Earl, we wouldn't be back here and you know it. And the only reason we're back here is because you've asked the same kind of question I have told you probably six to eight times that you can't ask what someone else saw.

DEFENSE COUNSEL: Now I'm asking you, Judge, am I permitted–

THE COURT: I am not going to rule ahead of time because I will not know what question you ask until the words come out of your mouth because you change from one second to the next, you changed the question from hand to fingers, whatever. So, I'm not going to rule ahead of time.

I know what a proper question is. If you ask a proper question that hasn't been asked and answered, I will allow the witness to answer it. It's that simple. And that's the way it's been since the very beginning.

DEFENSE COUNSEL: Fine, Judge.

THE COURT: But I am not going to wait for them to object. All right.

And I think the court–and I have case law that absolutely holds the court has the right to *sua sponte* control the proceedings and interject and, in effect, make its own objection if something that is being asked and answered as many times as so many of the questions you've asked have been asked and answered. So, I'm not going to wait for them to object. And I have a lot been butting in, but in the instances I haven't, it's because it's absolutely beyond–it has to be done to protect this jury from what you're doing to them with asking and re-asking and badgering and improper questions and no foundation for conversations without a point, without any apparent prove-up plan because it's not impeaching in the form.

Attempting to lay the foundation to impeach is all wrong and unspecific. You know, there is only one–I hope with your experience, you know, that in order to lay the foundation to impeach a witness, you have to say didn't you have a conversation with such and such a person at such and such a place and time and isn't it true in that conversation you said X, Y, and Z. What did they ask you, what did you tell them? That's not right. That's inappropriate. All of it is inappropriate.

You can't just flounder around and ask about all of these out-of-court conversations. There's no purpose to them, if there's no purpose to laying the foundation–

DEFENSE COUNSEL: Impeachment by omission. She is saying these things happened. And if I ask her did you ever tell an officer–

-14-

THE COURT: That's what we're talking about.

DEFENSE COUNSEL: I thought you said I didn't lay a proper foundation.

THE COURT: You haven't laid a proper foundation for all kinds of things you've tried to do. Some things you've tried to do, you have laid the proper foundation and you–of course, you've done it over and over and over again. Yes, you have. Over and over and over again.

It's five after 7:00 and it's time to wrap this up. And we don't have to be back here. And the reason we're back here is because for the final time I looked you in the eye in front of this jury and said will you please not ask this witness any more questions about what someone else saw. Isn't that what happened? Don't you agree that's what happened?

DEFENSE COUNSEL: Yes, it did, Judge.

THE COURT: And then two questions later you asked that question. How would you feel right now if you were me? Wouldn't you feel pretty much the same way that I do? This guy will not listen to what I am at this point begging him not to do. Will you please not do this, and without any hesitation whatsoever you go right ahead and you do it. I have had it. I mean it, I have had it.

DEFENSE COUNSEL: All right. I'm asking the Court–

THE COURT: No, you're not asking me anything. You're going to go out there and you're going to finish this recross that doesn't need to be done."

¶ 70    Defendant now argues that the trial judge "lambasted" defense counsel in chambers for repeatedly asking MS whether other people could see or hear certain events. The judge correctly noted that he had admonished defense counsel and that defense counsel had ignored him. The judge explained that he did not want to hold defense counsel in contempt and tried to ascertain what it was that defense counsel did not understand. The court also explained to defense counsel that he had continued to repeatedly ask questions and tried to ascertain if defense counsel accepted the principle of law regarding the objection "asked and answered." The judge specifically commented upon the questions defense counsel posed regarding whether MS had screamed. Despite defendant's characterizations of the judge's admonitions as "dressings-down," we believe the comments were entirely appropriate. The criticism, contrary to defendant's contentions, was neither "unwarranted" nor "inappropriate." Moreover, it was done outside the presence of the jury.

¶ 71    Defendant raises other discussions that took place in chambers. These sidebars were all had outside of the presence of the jury and therefore could not have resulted in a biased jury. As to the issue of whether they showed bias on the part of the judge himself, defendant has already conceded that he is not raising that argument. Defendant has not raised any of these alleged errors regarding the sidebars as freestanding errors. Thus, we need not further address the in-chambers discussions.

¶ 72    Defendant further notes that, during cross-examination of MS, the court sustained 55 objections, and that 13 of these were raised *sua sponte* by the court. Our review of the record shows that the majority of the rulings were correct and defendant does not raise them as

freestanding errors. Nonetheless, defendant contends that "the trial court would often not only state the basis for the ruling, but repeat the basis and criticize defense counsel's performance."

¶ 73    The record shows that, after sustaining five of the State's objections without comment, the following occurred:

"DEFENSE COUNSEL: You are out on the porch. You don't call, you don't scream, you don't yell. You go to the same area where you say Alex was at–

THE COURT: No, we're not doing this. We're not summarizing. Okay. Stop. Second time. Objection sustained. No more."

¶ 74    After this ruling, and sustaining an additional two of the State's objections without comment, the court made the following *sua sponte* comment: "Okay. Now, you ask the question and then you keep going, so that doesn't work either. If you're going to ask the question, you've got to let her answer it." Defense counsel responded: "Okay. I'm sorry."

¶ 75    After sustaining two more of the State's objections with no comments by the court to defense counsel, the following colloquy occurred:

"DEFENSE COUNSEL: Can you describe how [defendant] appeared now that you are looking at him just a few feet away?

MS: Can you repeat the question?

DEFENSE COUNSEL: Yeah. Can you describe how he appeared as you are looking at this person a few feet away?

ASSISTANT STATE'S ATTORNEY: Objection.

THE COURT: Sustained. It's a completely vague question.

DEFENSE COUNSEL: Can you describe his facial hair?

MS: No.

ASSISTANT STATE'S ATTORNEY: Objection.

DEFENSE COUNSEL: Can you describe if he was wearing glasses?

MS: No.

DEFENSE COUNSEL: Can you–

THE COURT: Sustained. These are asked and answered. She's already answered these questions. You're badgering the witness.

DEFENSE COUNSEL: Did the police ever ask you to describe him?

ASSISTANT STATE'S ATTORNEY: Objection.

THE COURT: Overruled. She can answer.

MS: Can you repeat the question?

DEFENSE COUNSEL: Did the police ever ask you to describe the offender?

MS: Yes.

DEFENSE COUNSEL: Do you recall what you told them?

MS: Some things.

DEFENSE COUNSEL: Did you ever tell them–

THE COURT: Sustained. Improper form.

DEFENSE COUNSEL: Did you ever say he had a mustache?

MS: No.

DEFENSE COUNSEL: Did you ever say he had glasses?

MS: No.

ASSISTANT STATE'S ATTORNEY: Objection.

THE COURT: Is there going to be some evidence offered that she did make these statements?

DEFENSE COUNSEL: That she didn't make these statements, Judge.

THE COURT: No. That she did make these statements.

DEFENSE COUNSEL: That she made a description, yes.

THE COURT: No. That she made the statements you just asked her if she made to the police. The objection is sustained."

The trial court's comments were warranted. Although defendant now claims this was error and argues that defense counsel was attempting to challenge MS's identification of defendant by eliciting testimony that, even close up, she did not see that he was wearing glasses, defense counsel's intention was entirely unclear because the questions asked were vague and confusing.

¶ 76    The trial court then sustained approximately 12 objections with either no comment, or an occasional brief comment including "asked and answered" or "no foundation." Some of these properly sustained objections were discussed earlier regarding defense counsel's continuing attempts to ask MS what someone else saw or heard.

¶ 77    The remainder of the sustained objections contain some court commentary that indicates a certain level of frustration on the part of the trial court. Nonetheless, the commentary is limited to explanations of what the defense counsel, in the court's opinion, was doing incorrectly. Moreover, in those instances where the trial court did comment regarding defense counsel's performance, each comment had a valid basis as the following shows:

"DEFENSE COUNSEL: Did you say he hurt you when he grabbed your arm and held you with great force?

THE COURT: Did you say, you mean today when she testified?

DEFENSE COUNSEL: Yes, that's what I'm asking judge.

THE COURT: Well, then ask it that way because otherwise at any time to whomever did you say that.

Now, if you want to recommit her to her direct testimony or her cross where you've already asked her this question, then fine. Say, did you say earlier when I asked you that he held you so that he hurt you, fine. Ask it that way if that's what you want to do to recommit her, otherwise it's asked and answered."

These rulings did not constitute error.

¶ 78    As the trial proceeded, however, the judge's frustration with defense counsel became somewhat more evident. MS testified that she did not remember the names of the two female police officers who arrived 10 minutes after the incident. Later during cross-examination, defense counsel attempted to elicit testimony from MS as to what she told the police officers, purportedly to reveal either inconsistencies with, or omissions from, that which she testified to at trial:

"DEFENSE COUNSEL: Did you ever say [defendant] literally rubbed your vagina with his hand to any, any officers?

MS: Yes.

DEFENSE COUNSEL: Did you say that to the first officers, the two lady officers?

MS: I don't remember.

DEFENSE COUNSEL: Well, did they ask you to tell them everything that happened?

MS: Not everything.

DEFENSE COUNSEL: Well, did they say to leave some stuff out?

ASSISTANT STATE'S ATTORNEY: Objection.

THE COURT: Sustained.

DEFENSE COUNSEL: What did they say to you when they arrived?

ASSISTANT STATE'S ATTORNEY: Objection.

THE COURT: Overruled.

MS: Can you repeat the question?

DEFENSE COUNSEL: What did those female officers say–

THE COURT: You know what, I'm going to sustain the objection. This is just too loose and not specific enough.

DEFENSE COUNSEL: Well, you talked to the female officers ten minutes after–

THE COURT: You've got to name someone you're calling to testify. If you're referring to a specific conversation, from now on you've got to use names.

DEFENSE COUNSEL: Okay. Do you know the names of those two lady officers?

THE COURT: She's already testified she doesn't.

DEFENSE COUNSEL: Okay.

THE COURT: If you're saying–if you've got a witness who's going to come in here and testify about something, then you have to specifically ask her if she made a statement to that person.

DEFENSE COUNSEL: Officer Stadler, star 13716, or Officer Ruiz-Oquendo, star number 4907, did you ever talk to those individuals?

THE COURT: No, it's got to be a person. Okay.

If you're going to call a witness to testify that she made some statement to the witness, then you have to ask her if she made that statement to the witness.

DEFENSE COUNSEL: All right. Judge, this is a report incorporated by two officers–

> THE COURT: Ask her the question. That's not her problem or my problem. That's your problem.
>
> DEFENSE COUNSEL: Judge, I don't have a problem.
>
> I'm just asking did you tell those two female officers who happen to be named Officer Ruiz-Oquendo or Officer Stadler, that the defendant actually touched your vagina with his hand?
>
> THE COURT: Sustained. Asked and answered. And her answer was yes. And I have it right in front of me in my notes. And if you want to go in the back, we'll have the court reporter read it back. Do you want to do that?
>
> DEFENSE COUNSEL: No.
>
> THE COURT: Okay. Fine."

Defendant argues that these rulings constituted error because "the trial court repeatedly criticized defense counsel before the jury for failing to comply with procedural and evidentiary rules that did not exist." Citing *People v. Lewerenz*, 24 Ill. 2d 295 (1962), defendant contends that these admonitions were particularly prejudicial because the rulings were incorrect and, therefore, the "*unjustified* criticism was particularly damaging." (Emphasis in original.)

¶ 79    Defendant argues that defense counsel was "entitled to inquire regarding [MS's] description of the attack to the police, as a description inconsistent with her trial testimony would be a prior inconsistent statement, whether it added or omitted significant details." Nonetheless, before prior inconsistent statements may be admitted for impeachment, a proper foundation must be laid on cross-examination. See, *e.g.*, *People v. Henry*, 47 Ill. 2d 312, 321 (1970). A proper foundation typically directs the attention of the witness to the time, the place, the person or persons to whom the statement was made, the other circumstances, and the substance of the inconsistent statement. The purpose of laying the proper foundation for impeachment by admission of prior inconsistent statement is to protect a witness against unfair surprise and to provide the witness with an opportunity to explain the statement with which he is confronted. *Id.*

¶ 80    If there is nothing inconsistent between the trial testimony and the prior statement, the court may properly prohibit the introduction of the prior statement. See, *e.g.*, *People v. Galindo*, 95 Ill. App. 3d 927 (1981) (foundation too general and inadequate where witness was not apprised of, and reviewing court was unable to determine, the *substance* of the alleged omission or the inconsistent statement or even if there was in fact an omission or the inconsistent statement, defense counsel at trial stated only that "apparently" the witness did not relate the same version of the shooting incident to the police officer at the scene, and defendant's brief referred to the omission as "allegedly" impeaching). Here, however, the basis of the trial court's ruling focused not on the substance of the statement but, rather, on defense counsel's failure to specify one particular officer by name. This was error.

¶ 81    The trial court erred in not permitting defense counsel to elicit the testimony because defense counsel's questions sufficiently apprised MS of the time, the place and the persons to whom the statement was made. See *People v. Henry*, 47 Ill. 2d 312, 321-22 (1970) (explaining that the conventional and formal method of establishing an adequate foundation

for the introduction of prior inconsistent statements need not be rigidly applied where the reasons for this rule–to "protect the witness against unfair surprise and to permit his explanation of the prior statement"–are substantially satisfied). This particular ruling was incorrect and, therefore, some of the comments to defense counsel were "unjustified" as defendant claims. We note further that MS testified on redirect that she had different conversations with different officers and did not remember each conversation she had with each particular officer.

¶ 82    Defendant also asserts that "[t]he trial court also repeatedly criticized trial counsel for attempting to refresh witness recollection on cross-examination, which the court appeared to believe was forbidden by basic evidence law." During cross-examination of Officer Mullany, defense counsel attempted to refresh his recollection regarding what the defendant was wearing as follows:

"DEFENSE COUNSEL: Is there anything in that report that refreshes your recollection as to what the defendant was wearing when you arrested him?

MULLANY: Not when we arrested him. Just at–that he matched the description of the prior flash message.

DEFENSE COUNSEL: And does that description that you say you heard match the description you generated in your report?

ASSISTANT STATE'S ATTORNEY: Objection.

THE COURT: Sustained.

DEFENSE COUNSEL: Well does this say a black sleeveless shirt or a black T-shirt in your report as the description of the offender?

ASSISTANT STATE'S ATTORNEY: Objection.

THE COURT: Sustained. This is all cross-examination. If you want to impeach him you can impeach him. Otherwise ask another question. He's not your witness. Refreshing his recollection is inappropriate to begin with. If you want to impeach him go ahead and impeach him.

Sustained."

¶ 83    The State conceded during oral argument that the trial court erred when it prohibited defense counsel from refreshing the recollection of a witness during cross-examination. As long as the correct procedures are followed, a witness's recollection may be refreshed during cross examination. See, *e.g.*, *People v. Shatner*, 174 Ill. 2d 133 (1996).

¶ 84    Defendant additionally notes that the court later sustained a *sua sponte* objection to defense counsel's attempt to refresh Detective Leal's recollection. When defense counsel sought to be heard at a sidebar, the court refused: "No. That's just not the right procedure." Defendant now argues that the court's refusal to hear argument was improper which, when combined with the court's unwarranted criticism of counsel's "inappropriate" questions, gave the jury the impression that the court was impatient with a defense counsel that did not know basic rules of evidence.

¶ 85    Thus, we conclude that there was error here. Again, however, defendant does not raise either of these errors as a freestanding error but instead argues that the trial court's

accompanying comments criticizing defense counsel, as well as the comments discussed earlier, resulted in a biased jury and constituted plain error. Having concluded that there was an error, we next consider whether this error was clear or obvious error under either prong of the plain-error doctrine.

¶ 86                                2. First prong of plain-error test

¶ 87    Defendant argues that the evidence here was closely balanced. He contends that the trial court's errors therefore constituted plain error under the first prong of the plain-error test.

¶ 88    Citing *People v. Naylor*, 229 Ill. 2d 584, 606-07 (2008), defendant asserts that the evidence in this case was closely balanced because it involved a "credibility contest" between uncorroborated testimony of State witnesses and defense witnesses. In *Naylor*, our supreme court stated that the evidence there was closely balanced because it depended upon the credible testimony of two police officers (that defendant sold drugs) and the credible testimony of defendant that he was swept up in a drug raid. *Naylor*, however, is distinguishable because there was no other evidence to corroborate or contradict either version. *Naylor* does not stand for the proposition that evidence is "closely balanced" whenever the defense version of events differs from the State's version and the accounts are "equally consistent with the physical evidence." Here, there was evidence corroborating the complaining witness's version of events which included the testimony of her two uncles, as well as the circumstantial evidence consisting of defendant's car, which contained his pants, being parked in the alley. Defendant's entire version of events strained credulity.

¶ 89    According to defendant, he was afraid of gang members who were following him yet, although he had a cell phone, he drove off the street, into an alley and, having been followed by the "gang members," stopped his car and got out of his car. He then ran from them into a gangway where he "bumped" into someone, yet did not know if it was a woman or a man. Defendant then ran, through various streets and alleys, even though nobody was chasing him. He did not look for police. He then ran back to his car, and saw people in his car, so he ran to a nearby truck driving school that he had attended even though he was supposedly unfamiliar with this area. Once at the truck driving school, rather than call the police, his father, or his wife, he called his workplace in Addison. He then asked the coworker to borrow a car and drive at least 50 miles round trip, to pick him up and drive him to his car which was within walking distance from where defendant was located. While waiting, defendant claimed to have walked to the car several times even though his coworker, whom he had asked to make this 50-mile journey, was en route.

¶ 90    Moreover, defendant's own testimony corroborated, in part, the complaining witness's version because he admitted that he was the person present at the scene and that he did run through the gangway. Although defendant claimed that he "bumped" into someone in the gangway in the daylight hours, but was not sure if it was a male or a female, the jury obviously found his testimony incredible. Thus, *Naylor*, which involved a defendant's credible version of events, is inapposite. See also *People v. Anderson*, 407 Ill. App. 3d 662, 672 (2011) ("Unlike the trial judge in *Naylor*, in the present case, the jury was not faced with two equally credible versions of the events."). The evidence here was not closely balanced.

Thus, review of this forfeited issue is not warranted under the first prong of the plain-error test.

¶ 91                                    3. Second prong of plain-error test

¶ 92    "Under the second prong of plain-error review, [p]rejudice to the defendant is presumed because of the importance of the right involved, regardless of the strength of the evidence. [Citation.]" (Emphasis omitted.) (Internal quotation marks omitted.) *People v. Thompson*, 238 Ill. 2d 598, 613-14 (2010). The Illinois Supreme Court has "equated the second prong of plain-error review with structural error." *Id.* (citing *People v. Glasper*, 234 Ill. 2d 173, 197-98 (2009)). "An error is typically designated as structural only if it necessarily renders a criminal trial fundamentally unfair or an unreliable means of determining guilt or innocence." *Thompson*, 238 Ill. 2d at 609; see also *People v. Cosmano*, 2011 IL App (1st) 101196, ¶ 78 ("Error under the second prong of plain error analysis has been equated with structural error, meaning that automatic reversal is only required where an error is deemed to be a systemic error that serves to 'erode the integrity of the judicial process and undermine the fairness of the defendant's trial.' [Citation.]"). Thus, we now consider whether the trial court's erroneous evidentiary ruling and comments constituted error "so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *People v. Sargent*, 239 Ill. 2d at 189.

¶ 93    Defendant conceded during oral argument that he is not claiming actual bias on the part of the trial judge himself. Moreover, the record contains no evidence of actual bias on the part of the trial judge. Rather, the issue raised by defendant is whether the trial court's conduct, even if unbiased, was so inappropriate that it caused the jury to be biased against him.

¶ 94    It is well settled that " 'a trial before a biased jury would constitute structural error.' " *Thompson*, 238 Ill. 2d at 610 (quoting *Glasper*, 234 Ill. 2d at 200-01). A finding that a defendant was tried by a biased jury would certainly satisfy the second prong of plain-error review because it would affect his right to a fair trial and challenge the integrity of the judicial process. *Thompson*, 238 Ill. 2d at 613.

¶ 95    Here, however, as in *Thompson*, defendant has not presented any evidence that the jury was biased in this case. *Id.* at 614 (court "cannot presume the jury was biased simply because the trial court erred in conducting the Rule 431(b) questioning"). Rather, as the State notes "all of defendant's claims of bias or prejudice are derivative claims[, *i.e.*,] he is not claiming that the judge ever expressed bias or hostility towards him, towards his case, towards his defense or towards his witnesses. Instead, his claim is that the judge expressed impatience and hostility towards his attorney which in the minds of the jury then *might have* transformed into bias against defendant." (Emphasis in original.)

¶ 96    Although trial before a biased jury is structural error subject to automatic reversal, a trial judge's failure to restrain his frustration toward defense counsel does not necessarily result in a biased jury. "A judge's display of displeasure or irritation with an attorney's behavior is not necessarily evidence of *judicial* bias against the defendant or his counsel." (Emphasis added.) *People v. Faria*, 402 Ill. App. 3d 475, 482 (2010) (citing *People v. Jackson*, 205 Ill.

-22-

2d 247, 277 (2001)). We are mindful, however, that "[t]he circuit court has a great influence on jurors at all stages of trial and therefore must exercise restraint over [its] utterances and refrain from unnecessary disparagement of issues. [Citations.]" (Internal quotation marks omitted.) *People v. White*, 2011 IL App (1st) 092852, ¶ 83. "Jurors are quick to perceive any leaning of the court and place great reliance upon what he says and does, so that his statements and intimations are liable to have the force of evidence and be most damaging to an accused." *People v. Lewerenz*, 24 Ill. 2d 295, 301 (1962). "It is extremely difficult for a reviewing court to read a jury's subjective thoughts." *People v. Nitz*, 219 Ill. 2d 400, 413 (2006); see also *People v. Pankey*, 58 Ill. App. 3d 924, 927 (1978) (same). The defendant bears the burden of showing that he has been harmed by the judge's remarks. See, *e.g.*, *People v. Snulligan*, 204 Ill. App. 3d 110, 115 (1990). Defendant has not met his burden under the second prong of the plain-error doctrine because he has not established that the trial court committed an error that was "so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *People v. Sargent*, 239 Ill. 2d at 189.

¶ 97    Although the trial court erred when it prohibited defense counsel from refreshing the recollection of a witness during cross-examination, this error, even when combined with the trial court's remarks to defense counsel, was not a clear or obvious error under the second prong of the plain-error doctrine. Additionally, our review of the record shows that the trial court made no comments during the majority of the rulings that would have caused the jury to be biased against defendant. The judge's commentary neither expressed nor intimated any opinion as to the merits of the defense evidence. See *People v. Garrett*, 276 Ill. App. 3d 702, 713 (1995) ("Reviewing the comments that the defendant cites, it is clear that the judge was attempting to control the trial rather than disparage defense counsel. Each of the comments had a valid basis and did not display a specific bias or prejudice against defense counsel."). The trial judge's comments were most likely the result of the trial judge's efforts to correct defense counsel and "move the proceedings along when counsel asked redundant or unclear questions." *Faria*, 402 Ill. App. 3d at 482 (noting that although the court could have shown a touch more patience when dealing with defense counsel, "a defendant is entitled to a fair trial and not a perfect trial"). We disagree with defendant's characterizations of the comments as "replete with manifestations of hostility" directed toward defendant or his counsel. While the trial judge may have become frustrated with defense counsel, there is no showing that he was hostile. Despite the court's commentary on the procedure it believed defense counsel should follow while questioning witnesses, nothing the trial judge said indicates that he had a low opinion of Mr. Lopez's defense.

¶ 98    Defendant relies on several cases involving reversible errors that were not reviewed pursuant to the plain-error doctrine. More importantly, however, the comments made in the instant case, although evidencing frustration on the part of the trial judge, were not comparable to the egregious comments at issue in the cases cited by defendant. Thus, even if defendant had not forfeited the error, it would be harmless in view of the overwhelming evidence against him.

¶ 99    In *People v. Pressley*, 160 Ill. App. 3d 858, 864-65 (1987), the court reversed and remanded for a new trial. The court stated:

"Certainly a trial judge is permitted a limited amount of impatience. But *in a close case*, partial or biased remarks have a greater impact and increase the likelihood that the case will be reversed. Some of the instances we have noted in isolation may have been proper, or not reversible error, or had sufficient justification under the circumstances. However taken together the remarks had the cumulative effect of depriving defendant of a fair trial." (Emphasis added.) *Id.* at 865.

The *Pressley* court explained: "It would unnecessarily lengthen this opinion to outline each instance in which the court displayed impatience. The record is *replete with manifestations of hostility* directed toward this defendant which necessarily denied him a fair trial." (Emphasis added.) *Id.* The court, however, did discuss some of those comments.

¶ 100        For example, the trial judge in *Pressley* "in an abrupt fashion prevented defense counsel from making an offer of proof which may have justified his line of questioning." *Id.* As the *Pressley* court further noted: "The impatient attitude of the trial judge toward defense counsel *** persisted throughout the trial. The trial judge repeatedly directed defense counsel to 'tie things up.' While it is not improper for the trial judge to express impatience about undue time being consumed, such remarks must be made with great caution or they may be prejudicial error. [Citation.] Additionally, at one point in the trial the trial judge made the following admonishment: 'The Court: Sustained. He already said Mexican. If you would listen to what your witness is saying you wouldn't have to put him in a box. You are worse then he is.' " *Id.* The trial judge's conduct in the instant case is qualitatively different from that which transpired in *Pressley*.

¶ 101        Defendant also cites *People v. Eckert*, 194 Ill. App. 3d 667 (1990), which is also distinguishable from the instant case. Similar to *Pressley*, the defendant in *Eckert* was unfairly prevented from making an offer of proof. When defense counsel persisted in his attempt to proffer evidence, the following colloquy occurred:

> " '[DEFENSE COUNSEL]: May I please make an offer of proof?
>
> THE COURT: No, you can't approach the bench. I don't want you up here.
>
> [DEFENSE COUNSEL]: Can I make an offer of proof?
>
> THE COURT: Turned off my hearing aid, can't hear a word you are saying.' "
> *Eckert*, 194 Ill. App. 3d at 670.

Later, with a different witness, the court allowed defense counsel to make an offer of proof, but ordered that it be done outside the presence of the trial judge. The *Eckert* court reversed and remanded, noting that counsel was allowed to make his offer of proof, but it was "without the benefit of having the trial judge present" and only "after disparaging remarks to defense counsel were made in the presence of the jury by the trial judge." *Id.* at 675. Thus, "[t]he court's insistence that it would not listen to any offer of proof made by the defense effectively prevented defense counsel from showing the trial judge the relevance of certain evidence so that the judge could make an informed decision as to admissibility." *Id.* The trial court's conduct in the instant case, although evidencing frustration with defense counsel, bears no resemblance to the "antagonistic manner" and expressed hostility toward defense counsel displayed by the trial judge in *Eckert*.

¶ 102        Here, the record shows that the majority of the judge's comments were made in response

to defense counsel's continual, undeterred asking of inappropriate questions and committing the same error over and over again. Many of the comments indicate that the trial judge was attempting to help defense counsel elicit the testimony. While we disagree with some of the circuit court's rulings, in light of the evidence, the context in which they were made, and the circumstances of the trial, defendant has failed to establish plain error because he has not shown that either the trial judge's comments, or incorrect rulings, caused the jury to be biased against him. Defendant has failed to establish plain error.

¶ 103                                    II. Time Limits on Closing Argument

¶ 104    Defendant next argues that the trial court violated his right to due process of law by indicating it would impose time limits on closing arguments and that it would allow the State more time than it allowed defendant. He contends that this unequal time limit violated his right to make a closing argument. Defendant notes that there is no Illinois precedent. The State contends that "this issue is moot where the trial court never actually curtailed the defense argument in any way" and "never cut defense counsel off or told him to wrap it up."

¶ 105    In *People v. Trolia*, 107 Ill. App. 3d 487, 502 (1982), this court stated that a defendant must demonstrate actual prejudice by the time limit imposed upon him. Although *Trolia* did not involve unequal time limits, we believe that this principle applies here. Defendant has failed to show how the unequal time allocation prejudiced him. He has failed to indicate what argument he was not allowed to make or how the time limit affected those arguments that he did make.

¶ 106    In *People v. Joe*, 207 Ill. App. 3d 1079 (1991), defendant's time for closing argument was erroneously cut short due to a clerk's error in signaling defense counsel that his time for argument was up after 25 minutes, rather than the previously agreed-upon 45 minutes. The trial court denied defendant's motion for a mistrial. On appeal, defendant argued that this ruling was an abuse of discretion. This court determined that the defendant did not show how he was prejudiced by the difference in argument. As the court noted:

> "Defense counsel did not request additional time, and the record reveals that he did address most of the relevant issues in the trial. Further, defendant's brief is devoid of any important points he wished to make but did not have the opportunity to do so because of the time limitation." *Id*. at 1085.

Therefore, the court held that the trial court's denial of the motion for a mistrial was not an abuse of discretion.

¶ 107    Similarly, here, although defendant complains generally about the disparity in the time limits, he has failed to state that he was unable to address the relevant issues or argue an important point. Although by our opinion we do not condone the imposition of unequal time limits on defense and the State, in this particular case, defendant has failed to show that the trial court's decision to do so deprived him of a fair trial.

¶ 108                    III. State's Comments During Closing Argument

¶ 109    Defendant next argues that his conviction should be reversed because the State made improper comments during closing argument regarding the credibility of witnesses. A defendant is entitled to a fair trial free from prejudicial comments by the prosecution. *People v. Burney*, 2011 IL App (4th) 100343.

¶ 110    Defendant concedes that defense counsel did not object and that any error is forfeited, but again argues that this court should review the error as plain error because the instant case was a "credibility contest" and the evidence was therefore closely balanced. We have already noted that the evidence was not closely balanced. Therefore, defendant has failed to show that the State's comments during closing argument were plain error entitling him to reversal of his conviction.

¶ 111    Defendant additionally argues that this court must vacate his conviction to redress the denial of his right to effective counsel. See *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail on a claim of ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and prejudice resulting from the alleged deficiency in counsel's performance. *Id.* at 687. "Because a defendant's failure to satisfy either part of the *Strickland* test will defeat a claim of ineffective assistance, a court is not required to address both components of the inquiry if the defendant makes an insufficient showing on one. [Citation.]" (Internal quotation marks omitted.) *People v. Edwards*, 195 Ill. 2d 142, 163 (2001). Thus, we " 'need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.' [Citation.]" *Id.*

¶ 112    Defendant argues that "[g]iven the closely balanced evidence [in this case] absent the State's improper argument, there is a reasonable probability that the jury would have resolved the credibility contest between the [State] and defense witnesses differently and the trial would have had a different outcome." We disagree. We have already concluded that the evidence in this case was not closely balanced and was instead overwhelming. Thus, defendant cannot demonstrate that his counsel's failure to object prejudiced the outcome of his trial, as required by the *Strickland* test. See *People v. Glasper*, 234 Ill. 2d 173, 215-16 (2009).


¶ 113                                 CONCLUSION

¶ 114    In accordance with the foregoing, we conclude that the defendant has failed to show that he was deprived of a fair trial by the judge's comments where the evidence was not closely balanced and has failed to show the jury was biased against him. Defendant failed to show that the trial court's decision to allow the State more time for closing argument than the time allowed defendant violated his constitutional right to make a defense. Additionally, defendant has failed to show that the prosecutor's comments during closing argument were plain error that affected the verdict where the evidence against defendant was overwhelming. The judgment of the circuit court of Cook County is affirmed.


¶ 115    Affirmed.