2020 IL App (1st) 171000-U

No. 1-17-1000

Order filed September 8, 2020.

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 MC2 002076 |
| | ) | |
| SANDRA RAMIREZ, | ) | The Honorable |
| | ) | Aleksandra Gillespie, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE LAVIN delivered the judgment of the court.
Justices Pucinski and Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held*: Although the evidence was sufficient to convict defendant of battery, defendant's conviction is reversed and the cause is remanded for retrial where the trial court committed plain error by failing, in a case where the evidence was closely balanced, to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) during *voir dire*.

¶ 2    Following a jury trial, defendant Sandra Ramirez was convicted of battery (720 ILCS 5/12-3(a)(2) (West 2016)) and sentenced to one year of conditional discharge. On appeal, defendant

challenges the sufficiency of the evidence, arguing that the State failed to prove that she touched the victim knowingly, as opposed to inadvertently, and that the touching was insulting or provoking. Defendant further argues that she is entitled to outright reversal or a new trial where the trial court failed to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) during *voir dire* and the State's opening and closing arguments prejudiced her. For the reasons that follow, we reverse and remand for retrial.

¶ 3     Defendant's conviction arose from the events of August 23, 2016. On that date, defendant and a companion, Jeff Hampton, distributed literature and displayed posters in front of Evanston Township High School. Defendant was arrested for making physical contact with the high school's director of safety, Matthew Driscoll. Following her arrest, defendant was charged by misdemeanor complaint with one count of battery.

¶ 4     At trial, Driscoll testified that August 22, 2016, was the first day of the school year; freshman attended only in the morning, and the rest of the grades attended only in the afternoon. Around noon that day, when the freshmen were leaving, Driscoll received several phone calls from parents and multiple students knocked on his door. The parents were concerned for their children's safety because "people" were in front of the school, engaging students "in an inappropriate way."

¶ 5     Driscoll, accompanied by another safety officer, Aubrey Murray, went outside and saw defendant, whom he identified in court, on the sidewalk just beyond school property, holding pamphlets and flyers. She was shouting slogans, telling students they were "associates in murder," and that the high school advocated "the murder of babies" and "the rape of young girls." Two posters nearby depicted an "ejected" unborn fetus and a black man in chains, with whip scars on his back. Driscoll observed that the students leaving and arriving at the high school were "very,

very concerned," and that most were scared. The students were asking what was going on, whether they were in danger, and whether they should go into the school.

¶ 6    One student's mother engaged defendant in a "yelling argument," so Driscoll asked the mother to stay in her vehicle while he addressed the situation. The mother responded, "Well, you better do it or we will." Driscoll asked defendant what she was handing out and if she "could *** please not bother the students," as they were scared, parents were upset, and "it would cause an issue." Driscoll told defendant he was worried about her safety as well. Eventually, the majority of the students either went into the high school or left the area. About 15 minutes later, defendant left with a "companion" and a baby.

¶ 7    The next day, August 23, 2016, was a full day of school for all students. Around 8 or 8:15 a.m., Driscoll started receiving phone calls from parents about people harassing their children outside the school. At the same time, students started knocking on his door, saying they were worried about what was going on. One student asked if the school would lock down. Driscoll called for additional safety officers, including Murray, and went to the front of the high school with the objective of securing the safety of the students and calming them down.

¶ 8    Outside, Driscoll saw defendant walking back and forth on the sidewalk, handing out literature and screaming at students that they were "an associate to murder," that the high school encouraged "the murder of babies" and "the rape of young girls," and that "Mr. Driscoll advocates for the rape of young girls" and "the murder of babies." Defendant was carrying a baby, and a man held the same posters from the day before. Driscoll observed several parents asking defendant and the man to leave their children alone. Parents also approached Driscoll and told him "we needed to do something about this." Driscoll was concerned for everyone's safety, including that of

defendant, so Driscoll, Murray, and another safety officer positioned themselves in line with the crosswalk that led to the high school.

¶ 9   The State published a surveillance video, which is included in the record on appeal. The video depicts an area in front of the school, including part of the lawn, the sidewalk, the street, a crosswalk, and part of the parking lot across the street. The crosswalk is in the upper left quadrant of the frame. The view is angled slightly downward. The footage is grainy and pixelated, and while multiple figures are discernable, faces and other distinguishing features are indistinct due to the video's low resolution, glare from the sun, and shadows cast over the crosswalk by trees. Driscoll agreed that the video depicted events around 8:13 a.m., even though the timestamp on the video was off by one hour.

¶ 10   In court, Driscoll identified himself and defendant on the video, as well as a point in time where defendant "bumped" him. In response to questioning by the State, Driscoll narrated the video as follows:

> "Q. We're going to start playing it from 8:13.39, and when you see something—
>
> A. So this is the point where the students are crossing where I was bumped. *** So I'm standing right here and this is the young lady, and she tries to get through me. And that's where I'm bumped and moved forward. I try to distance myself. There's no students around. There's no need to exacerbate the situation, just address the issue which at that point was [*sic*] I asked the unit to call base and to call the police as I was worried that she was provoking the incident, trying to make it more than it actually needed to be. So I was concerned for my safety, the safety of the students, and just worried about her provoking the situation and making it even larger.

Q. *** At approximately 8:13.45, more or less, you mentioned and pointed out for the jury that the defendant struck you from behind?

A. Yes."

¶ 11    Driscoll clarified that defendant struck him from behind while his back was to her. He stated he was not engaged with defendant prior to being struck. When defendant made contact with Driscoll, he was knocked off balance. He immediately turned around and saw her standing "right there." When asked how the contact made him feel, Driscoll answered that he was "very alarmed" and "concerned" about what "she was about to do next." Driscoll felt like he was "trying to be provoked into a situation," and added that he "worried for my safety and safety of students because I didn't know where she wanted to take this."

¶ 12    After being struck, Driscoll decided to call the police. Evanston police detective Clara Just responded shortly after Driscoll called. Driscoll told Just what happened, expressed his concerns, and disengaged from the situation. Eventually, he signed a complaint.

¶ 13    On cross-examination, Driscoll acknowledged that he first met defendant sometime in October 2015 when "they" were handing out literature on public property near the high school and telling students they were accomplices to murder. Students told Driscoll that they felt threatened by defendant's statements.

¶ 14    On August 22, 2016, Driscoll told defendant she was scaring the students, that some students were worried, and that he was concerned for defendant's safety because he felt some parents wanted to harm her. Driscoll also asked defendant if she could "do this" somewhere else. Defendant responded that Driscoll was an accomplice to the murder of babies and to the rape of young girls. Defendant also told passing students that "Mr. Driscoll advocates the rape of young

girls" and "the murder of babies." Driscoll denied attempting to block defendant from handing out literature or to block the signs that her companion was holding.

¶ 15     Driscoll stated that at the moment defendant made contact with him on August 23, 2016, he was stationary. He believed defendant was attempting to hand out materials at the time, but was not sure, as his back was to her. She was holding a child "on her front" and had literature in her hand. Defendant did not verbally threaten Driscoll prior to making contact with him. When defendant made contact with his shoulder and "back side," he was not in pain. He turned his head to see what happened and said to a fellow safety officer, "That's it. You saw this. *** We need to call the police right now. This is getting out of hand." Driscoll denied saying anything to defendant at that point in time, denied having said "gotcha" to her, and denied telling her that he would call the police and she would go to jail.

¶ 16     Driscoll stated that when Just arrived, he told her defendant came up behind him and "bumped into me, you know, pushed me." He also told Just that the contact was made "over my shoulder and back side," but did not recall his exact words or stating that defendant used her hands. Defense counsel asked Driscoll about defendant's use of her hands as follows:

"Q. And since your back was turned to the defendant, it's possible that she—you didn't observe any hand touching, did you?

A. I did.

Q. You observed her hand touching you?

A. It came across my shoulder.

Q. So you saw her hand come across your shoulder?

A. Yes.

Q. Was there anything in her hand?

A. I don't know for sure. I think there might have been some literature.

Q. Were there any students in the vicinity?

A. There were."

¶ 17   Defense counsel asked Driscoll whether the contact was insulting in nature. Driscoll answered as follows:

"A. I don't believe I said insulting. I may have said insulting. I don't believe I said insulting. I believe I said provoking.

Q. So it wasn't, in your opinion, insulting?

A. The statements she was making definitely were.

Q. But the contact was not insulting?

A. I was more concerned for my safety and her provoking a greater situation.

Q. Okay. You say that the contact was provoking. Who was it provoking?

A. I would say myself and the entire staff and students.

*** 

Q. In what way is this provoking to the entire staff and students?

A. Well, in schools today there's a lot of anxiety over active shooters, weapons you see in the news. So when students were coming in and they were expressing their anxiety and fears, and parents then wanting to do something that unknown and you had two people out there who were described by the parents and some students as militant and then they had provoking signs like the black person with whip marks who appeared to be a slave, it

provoked fears in the students. And then for there to be now a battery in conjunction, you don't know where it's going to go. In schools today you just can't scare children like that."

¶ 18    Murray testified that around 8 a.m. on August 23, 2016, Driscoll asked for assistance at the main entrance. When Murray got outside, he saw defendant, whom he identified in court, on the public sidewalk. Defendant was pushing a stroller, holding a baby, and attempting to hand pamphlets to students. Murray also saw a three-foot poster depicting a "mangled fetus." According to Murray, students, who were approaching the school from across the street and from both directions on the sidewalk, were terrified, shocked, and scared. Defendant was screaming at the students that they would be accomplices to murder. Murray stated that the objective of the safety officers at that time was to separate the students and the people handing out the pamphlets and to give the students a "safe passage" into the high school without being stopped.

¶ 19    Murray identified himself, Driscoll, defendant, and students on the surveillance video. He agreed with the prosecutor that the video was "a bit blurry." Murray described the video as depicting himself and Driscoll standing side by side, trying to create a "possible wall." Defendant, however, "was really adamant about handing out the pamphlets" and "tried to go through Mr. Driscoll and gave him, like, a shoulder check." Murray clarified that defendant was behind Driscoll when she made contact with him and stated that he observed Driscoll being knocked off balance due to the contact. He did not see Driscoll back into defendant or hear Driscoll say anything to her. Driscoll walked away and did not confront defendant, who continued yelling.

¶ 20    On cross-examination, Murray identified two other safety officers on the video. At times, they joined him and Driscoll in forming the "wall," which was not stationary, but rather, moved

about in order to stay between defendant and the students. Murray acknowledged that the safety officers formed the "wall" on the sidewalk, which was public property.

¶ 21    Just testified that she and her partner, Detective Willie Hunt, arrived at the high school around 8:15 a.m. on August 23, 2016. Just saw a large number of people in front of the school, including Driscoll and defendant, whom she identified in court. Driscoll reported to Just and Hunt that there had been a disturbance outside the school and that defendant struck him while his back was turned.

¶ 22    Just approached defendant, who was holding a toddler, and asked to speak with her regarding the incident. Defendant asked if she was being detained. Just answered affirmatively and asked defendant to hand the toddler to her companion, a man Just later learned was Hampton. In response, defendant walked away. Just followed. Two or three minutes later, defendant gave the toddler to Hampton and started rifling through her purse. Just, who had safety concerns with that conduct, asked defendant to put the bag down. After 15 or 20 seconds, defendant gave her purse to Hampton. When Just pulled out handcuffs, defendant started walking away. Hunt stopped defendant and Just handcuffed her. Just then performed a search incident to arrest, during which she patted down defendant's clothing and legs and checked inside her pockets. Just did not discover anything during the search. During the search, defendant screamed that Just was raping and sexually assaulting her.

¶ 23    On cross-examination, Just stated that Driscoll told her defendant struck him in the upper part of his body, on the right side. Just did not recall whether Driscoll said defendant struck him with her hands. After reviewing her police report, Just testified that Driscoll reported being struck from behind, turning, and seeing defendant behind him.

¶ 24     Defendant testified that she was involved in "outreach" for the "preborn and the abolitionist movement." Her activities included handing out literature and displaying posters on high school campuses. On October 1, 2015, she and Hampton, her boyfriend, went to Evanston Township High School. Defendant, who alternated between wearing her one-year-old son in a carrier and pushing him in a stroller, handed out literature on the public sidewalk while Hampton held "large images." Driscoll asked them to leave and told them the material was not authorized to be distributed to students. Driscoll repeatedly stepped in front of the stroller or in front of defendant when she was extending her arm to students, demanded the literature back from students, and screamed at the students to get onto school property.

¶ 25     On October 2, 2015, while defendant was taking a break from handing out literature at the high school to breastfeed her son, Driscoll walked "so close" to her that he hit her elbow. Defendant told Driscoll to stay away from her. Also on that date, Just detained defendant and demanded her identification. When defendant asked why, Just said she was "being investigated for a crime." Defendant provided her identification and was not charged with anything.

¶ 26     On August 22, 2016, defendant and Hampton went to the high school around 8 a.m. Hampton stood with two posters while defendant pushed her son in a stroller and passed out literature. Defendant denied yelling or screaming, but admitted that she and Hampton often raised their voices to be heard over traffic. Defendant denied "speaking out a message that the school was sponsoring rapists." She had literature comparing rape and abortion, though, and probably said something along the lines of, "[A]bortion covers up the crimes for rapists, pedophiles, and pimps by destroying the evidence." Defendant denied calling Driscoll a rapist, but told the freshmen that he had "assaulted" her in October 2015.

¶ 27    Defendant further testified that on August 23, 2016, she had been at the high school for 10 to 15 minutes before three safety officers formed a "human wall" and blocked the entire width of the public sidewalk. The "wall" of officers continued to move as she attempted to "stick" her right arm through with bookmarks and literature for the students. Defendant was carrying her son on her left hip, as he was two years and eight months old and was too heavy for a carrier. Eventually, defendant spotted a "gap" and stuck her arm through the space between two safety officers. According to defendant, "When Mr. Driscoll saw that I had found a gap in the coverage, he walked over and turned and backed into my arm, I believe, that was outstretched with the bookmarks." Defendant did not know where her arm touched Driscoll. Driscoll turned around to face her and said something to the effect of, "You're gone. Call the police." She did not recall whether Driscoll said anything to the other safety officers. Defendant stated she never intended to strike Driscoll. She denied striking Driscoll and denied being angry. Instead, she was disappointed at the efforts of the safety officers and the police to cover her signs and stop the distribution of literature.

¶ 28    Just arrived on the scene, and Driscoll called her over. Defendant did not hear what they said to each other. When Just approached defendant, defendant asked Just "if she was threatening me with arrest." Just did not answer, so defendant walked away. Just followed her and said she was being detained. Defendant stopped and asked why she was being detained. At that point, Just said defendant was being investigated for battery, as Driscoll had accused defendant of striking him. Defendant told Just that Driscoll had stepped backwards into her arm and suggested that Just look at a surveillance video, but Just declined. Just asked defendant to set her son down. Defendant told Just that she did not feel it was a safe place to set him down. When Just told defendant she was under arrest, defendant handed her son to Hampton. Just frisked her. Defendant denied telling

Just that she was raping her during the frisk. She stated, "I told her she was molesting me when she was frisking my breasts and pelvic area roughly." Defendant was taken to the police station and booked.

¶ 29    On cross-examination, defendant denied yelling at students or stating that the high school sponsored rapists and murderers. Defendant agreed that because the "wall" of officers was moving, there was a high probability "in [her] mind" that when she was sticking her arm through the "wall," she would come in contact with a security officer.  She clarified that when she suggested Just look at a surveillance video, she was referring to footage she thought she was recording on a Go Pro that was strapped to defendant's chest. However, the Go Pro's memory card was full and no footage was recorded on August 23, 2016. Defendant explained that she screamed about Just molesting her not because she wanted help, but because she wanted the students to see the way she was being treated.

¶ 30    Hampton testified that when he first met Driscoll, on October 1, 2015, Driscoll told him he was pro-life but did not like Hampton and defendant handing out literature at the school. On that date and on October 2, 2015, Driscoll tried to prevent Hampton and defendant from getting materials to the students by redirecting them, telling the students not to take the information, or standing in the way. Driscoll also told the students to discard the literature or give it to him. Hampton stated that Just was present on both dates in 2015, but did not interfere.

¶ 31    On August 22, 2016, Hampton and defendant went to the high school to hand out literature and display a poster depicting an image of a first trimester abortion.

¶ 32    On August 23, 2016, Hampton and defendant returned to the high school with literature, the abortion poster, and a second poster depicting a slave who had been whipped and had scars on

his back. The back of the poster contained text explaining how the abolitionist movement was tied to the pro-life movement. Hampton positioned himself on the sidewalk with the posters while defendant handed out literature. At some point, one or two police officers arrived and Driscoll and other safety officers exited the high school. Driscoll told Hampton, "I thought we had this settled last year." Hampton did not respond because he was focused on the students.

¶ 33    About 30 feet from Hampton, defendant was handing out literature to students with one hand while holding her son in the other. Four safety officers, including Driscoll, "immediately" tried to reroute the students. The safety officers formed a "shield" in front of defendant so that she would have to walk to her left or right to hand out literature. The shielding went on for about 10 minutes. Hampton testified as to what happened next:

> "What I observed was Mr. Driscoll made his way towards [defendant]. He was trying to prevent her—at times he would stretch out his hand trying to prevent [defendant] from getting literature to the students. [Defendant] was trying to stay away from him, but wherever she went, whatever she did, he kept trying to find some kind of way to stop the information from getting to the students' hands or he would tell them to walk around, don't take anything, or just give them to me, give them to security. That's what happened.
>
> ***
>
> I observed contact. It wasn't initiated by either one. He's trying to get the information. He's trying to prevent it. It happened. He bumped into her arm. That's what I observed."

¶ 34    Hampton stated that nothing obstructed his view of defendant and the safety officers. Driscoll and defendant were both "moving slightly" when they made contact, which Hampton

described as "Driscoll backing into her arm." After the contact occurred, Driscoll told Hampton, "Hey, look, she made contact with me." Hampton responded, "No, you were trying to prevent her from handing out literature to the students." The next thing Hampton saw was a police officer in front of defendant. When the officer started to arrest defendant, defendant handed her son to Hampton.

¶ 35    On cross-examination, Hampton explained that defendant was handing out literature on the sidewalk near the crosswalk where students were walking to the school from a bus stop. He also clarified that Driscoll was not part of the "wall" blocking defendant from the students, and that Driscoll was about 30 feet from him when he called to Hampton about defendant making contact with him. Hampton stated that he did not believe Driscoll was trying to make contact with defendant. Rather, he felt that contact was "going to happen eventually because one was trying to stay away, one was trying to prevent." Hampton also stated that he saw defendant and Driscoll make contact "more than once, though, that's for sure." Finally, Hampton related that he was standing close to defendant when Just arrested her and did not hear defendant say or scream that she was being molested.

¶ 36    The jury found defendant guilty of battery. Defendant subsequently filed a motion for judgment notwithstanding the verdict or a new trial. Following a hearing, the trial court denied the motion. The court thereafter sentenced defendant to one year of conditional discharge.

¶ 37    On appeal, defendant first contends that the State failed to prove her guilty of battery beyond a reasonable doubt where the evidence did not establish that her touching of Driscoll (1) was done knowingly, rather than inadvertently, and (2) was insulting or provoking.

¶ 38    When reviewing the sufficiency of the evidence, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). The credibility of the witnesses, the weight to be given their testimony, and the resolution of any conflicts in the evidence are within the province of the trier of fact, and a reviewing court will not substitute its judgment for that of the trier of fact on these matters. *People v. Brooks*, 187 Ill. 2d 91, 131 (1999). The testimony of a single witness, if positive and credible, is sufficient to convict. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). Reversal is justified only where the evidence is "so unsatisfactory, improbable or implausible" that it raises a reasonable doubt as to the defendant's guilt. *People v. Slim*, 127 Ill. 2d 302, 307 (1989).

¶ 39    As charged in the instant case, the State was required to prove that defendant "knowingly without legal justification by any means *** ma[de] physical contact of an insulting or provoking nature with an individual." 720 ILCS 5/12-3(a)(2) (West 2016).

¶ 40    An essential element of battery is that the defendant's conduct be knowing, not accidental. *Id.*; *People v. Phillips*, 392 Ill. App. 3d 243, 258 (2009). A person acts with knowledge of the result of her conduct when she is consciously aware that such result is practically certain to be caused by her conduct. 720 ILCS 5/4-5(b) (West 2016). Where, as here, a defendant denies that intent, the State may prove it through circumstantial evidence, *e.g.*, an inference drawn from the defendant's conduct surrounding the act and from the act itself. *Phillips*, 392 Ill. App. 3d at 259.

¶ 41    Regarding the requirement that the physical contact be done knowingly, defendant argues that when she stretched her arm though the human "wall" of safety officers, her intention was only to distribute materials to the students. She asserts that her contact with Driscoll during this

stretching was accidental, and that she was actually trying to avoid the safety officers who were blocking her from reaching the students. Defendant further argues that the force of the contact was not indicative of a knowing act, as it did not hurt Driscoll, but simply set him off balance. She highlights that she did not physically or verbally threaten Driscoll with violence prior to the touching, and did not say anything to him after the contact. Finally, she maintains that although she conceded on cross-examination that there was a high probability she would come into contact with someone if she stuck her arm through the "wall," this admission is insufficient to prove that her actions were knowing or intentional. Instead, she asserts that at most, her admission would show her actions were reckless.

¶ 42      The State responds that where Driscoll testified he felt a shove on his shoulder and upper back and Murray described the contact as a "shoulder check," there was substantial evidence that defendant intentionally and purposely struck Driscoll. The State also argues that the act of "reaching through the personal space of Driscoll and the safety officers was a deliberate and knowing act that also created an antagonistic environment, which resulted in Driscoll being knocked off balance." The State concludes, "Defendant knew exactly what she was doing because her conduct reflected the frustration she felt as Driscoll and the other safety officers performed their duties in a legal manner."

¶ 43      Defendant maintains that she only intended to distribute materials to the students on the other side of the human "wall" of safety officers, and that any contact with Driscoll that occurred when she reached through the "wall" toward the students was incidental, inadvertent, and accidental. The evidence, however, when viewed in the light most favorable to the prosecution (*People v. Campbell*, 146 Ill. 2d 363, 374 (1992)), reveals that defendant's contact with Driscoll

was not any of these things. Driscoll testified that defendant "bumped" him from behind with enough force to knock him off balance. During his testimony, he also described the contact as having been "pushed" or "shoved," and specified that the contact was made to his shoulder and "back side." Murray, consistent with Driscoll, testified that defendant gave Driscoll "a shoulder check" from behind. He also stated that the contact knocked Driscoll off balance. Based on the testimony of these two witnesses, the jury could rationally find that defendant's contact with Driscoll was not accidental, but rather, knowing, in that defendant was consciously aware her conduct was practically certain to cause contact with Driscoll.

¶ 44 The jury was not required to accept defendant's self-serving testimony that Driscoll backed into her arm, or Hampton's similar description of events, over the testimony provided by Driscoll and Murray. See *People v. Moreira*, 378 Ill. App. 3d 120, 130 (2007). The jury, which saw and heard Driscoll, Murray, Hampton, and defendant testify, was in the best position to weigh the witnesses' credibility and chose to believe the State's witnesses over those presented by the defense. This was the jury's prerogative in its role as trier of fact. See *People v. Moody*, 2016 IL App (1st) 130071, ¶ 52. We will not substitute our judgment for that of the jury on this question of credibility. *Brooks*, 187 Ill. 2d at 131. Defendant's argument that the evidence did not show that she knowingly made physical contact, therefore, fails.

¶ 45 Defendant next argues that the State failed to prove beyond a reasonable doubt that she was consciously aware that her contact with Driscoll was practically certain to be insulting or provoking. She asserts that her "stated and clear objective" when she stretched her arm through the "wall" of safety officers was to hand out literature and communicate with the students, and that these facts, even when viewed in the light most favorable to the State, fail to establish that she was

attempting to incite violence or was consciously aware that the contact that occurred was of a provoking nature. Defendant maintains that it is contrary to human experience to believe that a woman with a baby in her arms could be perceived as a threat to a person with training in safety and emergency situations, and that the context in which the contact occurred cannot satisfy the "provoking or insulting" requirement because she was exercising her right to freedom of speech. Finally, she argues that Driscoll's testimony that the contact was provoking because she was militant and the imagery she was presenting had "provoked fears in the students" shows that his reaction was based on the content of her speech, and not on the touching.

¶ 46 The State responds that the contact between defendant and Driscoll was insulting or provoking in any context, but that the "particular context" within which it took place "highlighted the fact that it was of an insulting or provoking nature." In discussing the context leading up to the contact, the State argues that defendant's conduct prior to shoving Driscoll showed that she was agitated when she engaged in a back and forth argument, yelling at a parent, and asserts that defendant engaged in "even more troubling behavior" when she launched a personal attack on Driscoll by injecting his name in her protest rant. Based on these circumstances, the State maintains that the jury had ample evidence to find that the shove amounted to insulting or provoking contact. The State further observes that Driscoll testified he was provoked by the contact and notes that his reaction after being shoved was to turn to another safety officer and say that they needed "to call the police right now" because the situation was "getting out of hand." The State asserts that from this statement, the jury could infer that Driscoll wanted the police called because any physical contact with defendant was "offensive, unwelcomed, [and,] therefore, insulting and provoking."

¶ 47   Any physical contact, even one that does not injure the victim, may be deemed insulting or provoking based upon the factual context in which it occurs. *People v. DeRosario*, 397 Ill. App. 3d 332, 334 (2009); see also *People v. Fultz*, 2012 IL App (2d) 101101, ¶ 49 ("the trier of fact may take into account the context in which a defendant's contact occurred to determine whether the touching was insulting or provoking"). Defendant asserts that in order to establish the "insulting or provoking" element of battery, the State was required to prove that she intended her actions to be of an insulting or provoking nature or that she was consciously aware that the contact would accomplish such a result. In making this argument, defendant relies on *People v. Craig*, 46 Ill. App. 3d 1058, 1060 (1977), in which this court held that the prosecution must prove that the "defendant's conscious objective or purpose *** was to accomplish an insulting or provoking physical contact." However, *Craig* involved an earlier version of the battery statute that required a showing that the defendant acted "intentionally and knowingly." See *id.* (citing Ill. Rev. Stat. 1975, ch. 38, par. 12-3(a)(2)). The version of the statute at issue here only requires knowing contact. 720 ILCS 5/12-3 (a)(2) (West 2016). As such, we do not find *Craig*'s holding regarding intent to be on point.

¶ 48   Our review of relevant precedent reveals that the appropriate question is whether the evidence was sufficient to establish that the contact was insulting or provoking to the victim. See, *e.g.*, *Fultz*, 2012 IL App (2d) 101101, ¶ 50 ("The jury could also have reasonably inferred that [the victim] was insulted and/or provoked where he reacted by pushing defendant aside"); *People v. Wrencher*, 2011 IL App (4th) 080619, ¶ 55 ("The jury also could infer that the police put a 'spit hood' on defendant because contact with his saliva and blood was repulsive and dangerous to them and, therefore, insulting and provoking"); *People v. Dunker*, 217 Ill. App. 3d 410, 415 (1991)

("There was sufficient evidence for the jury to conclude [the victim] was insulted or provoked by defendant's touching").

¶ 49    Here, we find the evidence, viewed in the light most favorable to the prosecution, was sufficient to prove the "insulting or provoking" element. Shortly before making contact with Driscoll, defendant had yelled to passing students, "Mr. Driscoll advocates for the rape of young girls" and "the murder of babies." She then bumped, pushed, shoved, or shoulder checked him with enough force to knock him off balance. From these circumstances, the jury could have reasonably inferred that the contact was a knowing insult or provocation. Moreover, Driscoll's perception of the nature of the contact was clear from his testimony. On direct examination, he explicitly stated that when defendant made contact with him, he was "very alarmed" and felt like he "was trying to be provoked into a situation." Then, on cross-examination, Driscoll reiterated that the contact was "provoking" in nature, and when defense counsel asked whom the contact was provoking, Driscoll answered, "[M]yself and the entire staff and students." While the victim of a battery does not have to testify that he was provoked (*People v. Wrencher*, 2011 IL App (4th) 080619, ¶ 55), here, Driscoll did so, and the jury was entitled to credit his testimony.

¶ 50    After viewing the evidence in the light most favorable to the prosecution, which we must, we find that a rational trier of fact could have found defendant guilty beyond a reasonable doubt. The evidence is not "so unsatisfactory, improbable or implausible" that it raises a reasonable doubt as to defendant's guilt. *Slim*, 127 Ill. 2d at 307. Defendant's challenge to the sufficiency of the evidence fails.

¶ 51    Defendant's next contention on appeal is that during *voir dire*, the trial court violated Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) by asking the prospective jurors whether

they "disagree[d] with" the principles enumerated in the rule, rather than whether they accepted or understood them. Defendant acknowledges that she failed to preserve this issue by not objecting at trial. Nevertheless, she asserts that we may reach the issue as first-prong plain error. The State concedes that the trial court erred but maintains that plain error review is unavailable because the evidence at trial was not closely balanced.

¶ 52    Rule 431(b), a codification of the principles set out in *People v. Zehr*, 103 Ill. 2d 472, 477-78 (1984), requires the trial court to ask each potential juror if he or she understands and accepts four principles: (1) the defendant is presumed innocent of the charge or charges against him; (2) before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) the defendant is not required to offer any evidence on his or her own behalf; and (4) if a defendant does not testify, it cannot be held against him. Ill. S. Ct. R. 431(b) (eff. July 1, 2012). Rule 431(b) does not contain a "precise formula for trial judges to use in ascertaining jurors' prejudices or attitudes." *People v. Emerson*, 122 Ill. 2d 411, 426-27 (1987). However, it does require trial courts to address each enumerated principle and "mandates a specific question and response process." *People v. Thompson*, 238 Ill. 2d 598, 607 (2010). The trial court is required to ask each juror if he or she understands and accepts each of the principles set out in the rule. *People v. Jackson*, 2019 IL App (1st) 161745, ¶ 43.

¶ 53    Here, the transcript of proceedings shows the trial court addressed the venire as a whole, explaining that the defendant is presumed innocent, that the State carries the burden of proving the defendant guilty beyond a reasonable doubt, and that the defendant does not have to present any evidence. After explaining each principle, the court asked the venire, "Does anyone disagree with this rule of law?" or "Does anyone disagree with that rule of law?" One potential juror initially

raised his hand regarding the State's burden, but after a short discussion with the trial court, indicated he agreed with the proposition. No one else indicated any disagreement.

¶ 54     This court has held that asking whether potential jurors "disagree with" the *Zehr* principles is clear error. *Id.* ¶ 45; *People v. McGuire*, 2017 IL App (4th) 150695, ¶ 31; see also *People v. Sebby*, 2017 IL 119445, ¶ 49 (asking potential jurors whether they have a "problem" with the *Zehr* principles is clear error). As such, we agree with the parties that the trial court committed clear error in the instant case.

¶ 55     Having found clear error, we must determine whether plain error review is appropriate. As explained above, under the doctrine of plain error, a reviewing court may, in its discretion, excuse procedural default if a clear or obvious error has occurred and either (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *Staake*, 2017 IL 121755, ¶ 31. Here, defendant argues that the first prong applies. She asserts that the evidence in her case was closely balanced because the State failed to show, beyond a reasonable doubt, that she was acting knowingly or intentionally when she touched Driscoll or that the touching was insulting or provoking, and because the outcome of the trial depended on two versions of events that were both credible.

¶ 56     "A 'closely balanced' case is 'one where the outcome of the case would have to be different had the impropriety not occurred.' " *Jackson*, 2019 IL App (1st) 161745, ¶ 47 (quoting *People v. Pierce*, 262 Ill. App. 3d 859, 865 (1992). "In determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative,

commonsense assessment of it within the context of the case." *Sebby*, 2017 IL 119445, ¶ 53. In conducting this evaluation, a court must assess the evidence on the elements of the charged offense or offenses, along with any evidence regarding the credibility of the witnesses. *Id.* Considering whether evidence is closely balanced does not involve the sufficiency of close evidence but, rather, the closeness of sufficient evidence. *Id.* ¶ 60. If the defendant succeeds in carrying the burden of showing that the evidence is closely balanced, the error is actually prejudicial. *Id.* ¶ 51.

¶ 57 Evidence has been found to be closely balanced where each side has presented credible witnesses or where the credible testimony of a witness is countered by evidence that casts doubt on his or her account. See *Sebby*, 2017 IL 119445, ¶ 63; *Jackson*, 2019 IL App (1st) 161745, ¶ 48. In contrast, evidence has been deemed to be not closely balanced when one witness's version of events was either implausible or was corroborated by other evidence. See, *e.g.*, *People v. Lopez*, 2012 IL App (1st) 101395, ¶¶ 88-90 (evidence not closely balanced where circumstantial evidence supported State's witnesses' testimony while defendant's version of events "strained credulity"); *People v. Anderson*, 407 Ill. App. 3d 662, 672 (2011) (evidence not closely balanced where defendant's version of events was implausible).

¶ 58 Defendant relies on *Sebby* in support of her argument that the evidence here was closely balanced. In *Sebby*, our supreme court determined that the evidence was closely balanced where the testimony of the State's witnesses "was largely consistent, but so was the testimony of the defendant and his witnesses." *Sebby*, 2017 IL 119445, ¶ 61. The supreme court stated that the outcome of the case turned on how the fact finder resolved a "contest of credibility," and concluded the evidence was closely balanced because neither party presented extrinsic evidence to

corroborate or contradict either version and because both versions were credible. *Id.* ¶ 63 (quoting *People v. Naylor*, 229 Ill. 2d 584, 606-07 (2008)).

¶ 59    Here, the jury heard one version of events from Driscoll and Murray and another from defendant and Hampton. Neither version was implausible or fanciful. The only nontestimonial extrinsic evidence presented at trial was the surveillance video.

¶ 60    According to defendant, "On the video, [defendant] can be seen handing leaflets to students and Driscoll and his security team moving around [defendant] and attempting to block her in order to prevent her from reaching the students." Defendant indicates that these events are depicted at "9:13:00 – 9:13:46.6." The State asserts that at "9:13:00 – 9:13:46.6," the video depicts defendant "handing leaflets to students while Driscoll and other security officers are moving around defendant to prevent her from reaching the students," and that the video "captured defendant's insulting or provoking contact to Driscoll."

¶ 61    We have viewed the video and cannot agree with the State that it corroborates Driscoll's and Murray's testimony over defendant's and Hampton's. As Murray noted at trial, the video is blurry. During the timeframe highlighted by the State at trial, "8:13.39" to "8:13.45,"[1] multiple figures can be seen at the top left corner of the screen, moving about. But it is not clear that any of these figures make contact with each other, much less who may have initiated any such contact.

¶ 62    We cannot see how the video footage of the event would have aided the jury in its deliberations. As such, the case presented a straightforward contest of credibility between the

---

[1] Driscoll testified that the video depicted events that occurred around 8:13 a.m., even though the timestamp on the video was off by one hour, and the State consistently referenced the 8 o'clock hour when highlighting portions of the video at trial. In their briefs on appeal, both defendant and the State cite to the inaccurate timestamp.

accounts of the State's witnesses and the defense witnesses. Where credibility was the only basis on which this case could be decided, the evidence was closely balanced under *Sebby*. See *People v. Foster*, 2020 IL App (2d) 170683, ¶ 60 (evidence was closely balanced where outcome of trial turned on how the jury resolved plausible but conflicting testimony); *People v. Stevens*, 2018 IL App (4th) 160138, ¶ 74 (evidence was closely balanced where the "case boiled down to a clear question of credibility"); *People v. Daniel*, 2018 IL App (2d) 160018, ¶¶ 31-32 (evidence was closely balanced where the case presented a credibility contest with each side providing some evidence that was consistent with that of other witnesses and some that was not consistent).

¶ 63    Where the evidence was closely balanced, the trial court plainly erred when it failed to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). *Daniel*, 2018 IL App (2d) 160018, ¶ 32. In these circumstances, we must reverse and remand for a new trial. *Foster*, 2020 IL App (2d) 170683, ¶ 62.

¶ 64    We are mindful of defendant's argument that because she has already completed her sentence and her conviction was "not of a serious offense," this court should reverse outright rather than remand for a new trial. In making this argument, defendant relies on *People v. Campbell*, 224 Ill. 2d 80 (2007). There, the defendant was charged with driving with a suspended license. *Id.* at 82. The defendant advised the trial court he would proceed *pro se*, but the trial court failed to admonish him pursuant to Illinois Supreme Court Rule 401(a) (eff. July 1, 1984). *Id.* at 87. Our supreme court noted that ordinarily such error would justify reversal; however, it declined to remand for a new trial, finding that doing so "would be neither equitable nor productive" because the defendant had already discharged his sentence of 12 months' conditional discharge. *Id.* at 87. Instead, our supreme court simply vacated the defendant's conviction. *Id.* at 87-88.

¶ 65    In general, however, vacatur of a conviction is followed by remand for retrial. *People v. Vazquez*, 2011 IL App (2d) 091155, ¶ 18. As such, this court has limited *Campbell*'s remedy of vacating the conviction without remand for retrial to the facts of that case. *Id.*; *People v. Nemec*, 2019 IL App (2d) 170382, ¶ 24. The charge at issue in *Campbell* was a traffic offense that does not inherently involve danger to the public. *Vazquez*, 2011 IL App (2d) 091155, ¶ 20. Here, the charge was battery, an offense that is more serious because it is directed against a person. 720 ILCS 5/12-3(a)(2) (West 2016); see *Nemec*, 2019 IL App (2d) 170382, ¶ 24 (driving under the influence is a more serious offense than driving with a suspended license because it involves a clear danger to the public); *Vazquez*, 2011 IL App (2d) 091155, ¶ 18 (harboring a runaway and contributing to the delinquency of a minor are more serious offenses than driving with a suspended license because they inherently involve harm and danger and are directed against minors). As such, the instant case is distinguishable from *Campbell* based on the seriousness of the offense at issue. We conclude that remand for retrial is appropriate.

¶ 66    Given our disposition, we need not address defendant's final contention on appeal, namely, that the State's opening and closing arguments prejudiced her and constituted plain error where the prosecutor "improperly criminalized [defendant's] first amendment right to free speech by mischaracterizing [defendant's] outreach as creating an unsafe environment, and praising Driscoll's unconstitutional actions." Even if we were to find that the State's arguments were improper and constituted plain error, the appropriate remedy in this case would be to remand for retrial, the same relief to which defendant is entitled due to the Rule 431(b) error. See *Nemec*, 2019 IL App (2d) 170382, ¶¶ 24-25; *Vazquez*, 2011 IL App (2d) 091155, ¶¶ 18-21.

¶ 67    Finally, although the evidence in the instant case was closely balanced, it was sufficient to sustain the jury's verdict, so a retrial presents no double jeopardy issue. See *People v. Piatkowski*, 225 Ill. 2d 551, 567 (2007). Because the trial court committed plain error in its Rule 431(b) admonitions, defendant's conviction is reversed and the case is remanded to the circuit court for further proceedings.

¶ 68    Reversed and remanded.